Good morning, Your Honors. May it please the Court, Peter Dion Kindom, for Plaintiff and Appellant, Mr. Willis. When I read the District Court's decision, I thought we'd had a trial on the merits, and that she was setting forth the reasons why she, as a trier of fact, was ruling the way she was ruling. But this was a summary judgment motion, not a trial on the merits. And I think that when you look at the evidence that was presented in opposition to the summary judgment, construing it as the Court was required to do, in light most favorable to my client, the party opposing the motion, that evidence was more than ample to support a finding that there was an employer-employee relationship. And I think that District Court simply ignored the evidence that we presented to bolster her decision that it wasn't enough as a matter of law. And that was her error on a summary judgment motion. Now, the applicable standard is disjunctive, as enunciated by the California Supreme Court in Martinez v. Combs. To employ, then, under the IWC's definition, has three alternative definitions. It means to exercise control over the wages, hours, or working conditions, or to suffer or permit to work, or to engage, thereby creating a common-law employment relationship. We're focusing on our argument, is that there was more than sufficient evidence in the record that they controlled the hours or working conditions of the mud men. Sotomayor, let me make sure I understand what this case is about. Yes. This is a putative class action. Yes. And you're trying to claim that your client and others were joint employees of both Enterprise and Drill Tech? That was the allegation, that they were both employers under the law. Both employers. Yes. And there's no question that there was an employee of one of them, right? Right. And we settled with that. Enterprise. Enterprise. We settled with Enterprise. And the reason that you want him to be a joint employee of Drill Tech, as well, is what? Why? Because they have the money. Frankly. Well, that's what we figured. All employers are jointly and severally liable for violations of employment law. And you've got a small operation, Enterprise, who has no money, single owner, you know, they don't have the ability to remedy the violations that occurred. And those violations occurred under Drill Tech's watch. So you say as long as the defendant controlled any one of those things you mentioned, they're an employer? That's what Martina's court holds. They're alternative definitions. By the way, I'd like to reserve five minutes. All right. Thank you. I apologize for not doing that earlier. It's all right. So they're alternative definitions. You exercise control over the wages, hours, or working conditions. And then the second test, suffer or permit to work, which means you have the ability to prevent them from even being on your site. And clearly we have evidence for both. In terms of the control of the working conditions and hours, we have testimony in the record with respect to the issue of control, is that the Drill Tech company men had the power to tell Willis what to do and what not to do and what to stop doing. If he made a recommendation as to certain mud fluids, they could say, no, we're not going to do it. Do this. If that's not controlling the work, working conditions of the mud man, what is? Tell him what to do and how to do it. That's direct supervision. In terms of the elements of the hours, we have testimony about when he was told to do it, how to do it, to add more mud if he had made a certain recommendation. But who set the schedule, the work schedule, the time you have to be at work, the work hours, the vacation days? Who set all of that? The company men. We have evidence, testimony that they had the power to and did schedule Willis to do other work, when to come down to the well. They could wake him up and did wake him up in the middle of the night and said, no, we've got an emergency. Come down and do it. Did they call him directly? Yes. He was on site in a trailer. So he was basically there 24-7, and they could call him down whenever they wanted to and did. If he wanted to leave the premises, he had to get their permission. And they could say, no, we want you here. So they certainly controlled the working conditions. If they can say when you can leave, when you can sleep, when you have to wake up and do what we tell you to do. If he committed a fireable offense, would Drill Tech be able to terminate his employment, not just at that site, but would Drill Tech be able to terminate his employment? They would be able to effectively terminate his employment on any site that they were at. On the site, but would they be able to terminate his employment status? Well, not as a direct employee of Enterprise. Right. But they could basically say, Enterprise, we don't want him on any of our wells. So he's basically blackballed. And the case law says if you can do that, you have the ability, directly or indirectly, to prevent them from working. Well, let me try to understand the work site here. It's a well site, a drilling site. They're drilling for oil. Right. The site is owned by this ______. Lynn Energy, I think. And Lynn contracts with Enterprise to provide the mud engineers. Is that right? The employees? Yes. The people who are going to do the work? Well, the mud engineering work. The mud engineering. Correct. Okay. And then, so the mud engineers are hired by Enterprise, and Lynn has a contract with Enterprise. To provide them. To provide those people who are doing that work. Okay. And then, Drill Tech is actually, what, running the drilling operations? Exactly. Does everybody else work for Drill Tech? Well, Drill Tech is hired by Lynn to basically be the operator of the drill site. They're in charge of every aspect of the drill site. All the subcontractors. The people who run the machinery and dig the holes and do all that. Exactly. They may not all be direct employees of Drill Tech, but Drill Tech runs the entire operation, runs all the subcontractors. Okay, so it's sort of like a general contractor, subcontractor analogy. If you will. And the general contractor in this case, typically you don't have a general contractor telling a carpenter, okay, use a 2x4, not a 4x6 or a 2x6 or an 8x12 to put this framing up. But that's exactly what happens here. And we put in the record, when my guy would make recommendations as to the quality or the consistency of the mud, the drilling fluids, the company man, Drill Tech's guy, would say, no, I don't want you to do that. I want you to do this. That's direct working condition control and supervision. You can't get more than that. That's the same thing. Well, but I'm trying to analogize it to something that I used to know something about. Probably don't know anything about it anymore. But about a construction site where you have a general contractor and a subcontractor. And the general contractor tells the subcontractors when they're supposed to do their work. The plumbing contractor doesn't bring his people on until the general contractor says that you come. But those employees, the plumbers of the plumbing subcontractor, are working for the plumbing subcontractor. They're not working for the general contractor. Well, that's the formality of the situation. But the law says you look through formalities to substance. And that's why the three-part test enunciated in the IWC, recognized by the court in Martinez, says that you don't have to have a formal, you're the W-2 employee who gets, that's the only employer, right? No. The court said you look to exercise control over the wages, hours, or working conditions. It doesn't say you have to be, actually receive your paycheck, right? It's a substantive thing. It's substance, not form. And that's what the whole point is. Otherwise, you could have a general contractor basically minutely and micromanaging every sub, which is exactly what happened as alleged in the evidence shows in this case, that the drill tech is the general, so to speak, was supervising every aspect but didn't leave it to, okay, you handle yours, we're not going to get involved with this thing. They were intimately involved and told our guy what to do, what fluids to use. What fluids not to use. Are there any other subcontractors on the site? There probably were, but that wasn't the focus of our case. Okay. I have 4 minutes and 25 seconds. I'll reserve. All right. Thank you. Thank you, counsel. Good morning, Your Honors. May it please the Court, Derek Hovel on behalf of defendant and respondent drill tech. Your Honor, I think your focus on the workplace setting is an important one, and it is in the record what is actually going on at a drill site. So let me clarify a little bit. There is one owner-operator, and that owner-operator, as you said, contracts with Enterprise to provide drilling mud services, engineering services. There are multiple other subcontractors, in the record at least six or seven, all doing distinct tasks, a tool shaper, a drill runner, different categories, all that have to work together. The well site coordinator, which is my client, drill tech, is hired directly by the owner-operator. So we have a situation here, and in the contract, what their responsibilities are, and this is what the record bears out, they are basically like a traffic coordinator. They coordinate the different functions that go on at the site, and they make sure that things are on schedule, and that is their job. Now, the fact is, in this case, the plaintiffs are trying to create an employment relationship, under a scenario that I have never seen in any case law under a joint employment arrangement, and that is because there is one critical issue that is missing here. There is no relationship between drill tech and Enterprise. There is no contract. There is no parent-subsidiary relationship. They are completely separate peer companies, and the only reason they happen to work together is because they both get hired by Linberry on certain drill sites and happen to be working there together. So drill tech is there coordinating functions, and Enterprise is there doing its... So do you agree that this is roughly like a general contractor? Your Honor, I would say this is even farther removed than that, because there is no contractual relationship even between the general contractor and the subcontractor, so to speak, in this situation. They are both subcontractors. They are both separate subcontractors, exactly. And the reason why that is important, Your Honors, is because there is a critical missing link in Plaintiff's argument when he says, well, the mudmen were told what to do or they were told when to do this. And by the way, Plaintiff's, Mr. Willis's declaration really is inconsistent with a large portion of his deposition testimony, which clearly set out his work functions and really explained it more as a collaborative-type environment, which is what it is. He would do his tests. In his testimony, he said it was you alone who knew how to run your test because of your personal knowledge. Yes. And it was you alone who knew how to draw the samples for the mud testing. Yes. And you alone created the reports because of your personal knowledge. Yes. And then he goes on to explain that we would discuss with the well coordinator as well as other subcontractors, the tool shaper, the drill bit operator, how is this working? What's going on? What's the best way to do this? So now Mr. Willis, in his declaration, tries to transform those conversations into I was being told what to do by the well site coordinator. And the reason I know I was being told what to do is because he was the boss man. He was the head guy. It's a circular argument. It's all semantics. And we know it's semantics because there's no authority. And that's the important part. There's no authority, either contractual or otherwise, for the well site coordinator to do anything to Mr. Willis other than report things to the owner-operator. And that's actually within the contract of the owner-operator Lynn Barry and Enterprise that the owner-operator has the ability to remove Enterprise people from the site. But that's it. And, of course, Your Honor, Drill Tech has no ability to hire, fire, discipline, demote, or otherwise discipline in any way the Enterprise mud men. So we have a situation here where the definitions of to be an employee under California law, under the Martinez test, which opposing counsel set forth, are being stretched and construed in such an unrealistic way that clearly case law did not anticipate it. And we know that just from a common sense perspective because if you follow this to its logical extreme, you basically have any client-service relationship becoming an employer one where a client is over, perhaps, I know I have it in my field of work, an overbearing client telling an associate what to do all the time, calling five times a day, I want the brief written this way, I want you available at this point in time. What's to distinguish that from this? Well, I'll tell you it's even more closer to an employer relationship in that case because there actually is a contract. So I was kind of in my mind thinking, well, what's an analogy here? Maybe it's a local counsel to a primary counsel out-of-state relationship where the local counsel is being told, directed what to do by the primary counsel. That's a construction analogy which seems to be a little closer. That might be the best one. I don't know. But you're saying that Lynn, the owner, has a contract with Enterprise and a contract with Drill Tech. Separate and distinct. So Drill Tech's contract is basically to coordinate the work or part of its work is to see when other people are supposed to be on the job? In a sense, it's in the contract with Lynn Berry. It says work coordinator. So basically, okay, when is this subcontractor going to be doing this job? Yes. So that's its job. Its contract with Lynn, its job is to tell other subcontractors when to do their work. To some extent, maybe when the scheduling. But not how. And that is not in the record what opposing counsel said. Not how. And that's why we do have admissions from. And not what to pay them. And not what to pay them whatsoever. And that's admitted and undisputed. And not who to hire or fire. And not who to hire or fire. And, again, at the most, what plaintiffs will cite to is this idea that you can run someone off the site. Now, this is speculative. There's no evidence this is ever actually done and who that might have been done to. But now Mr. Willis, appellant, is claiming, well, Drill Tech could run people off the site. And, again, that's just a reporting function to the operator who then has the ability to do what they're going to do. Or the direct employer who's going to have the ability to do what they're going to do. Much like a law firm would do if a client complained about an associate's performance. So I think that's a linchpin here. And the case law actually supports this interpretation. If you look at Martinez, yes, those are the tests that were set out. And the court very carefully went through numerous factors here. So to exercise control over the wages, hours, or working conditions. And in Martinez, that was interpreted to mean authority to hire or fire, train in the performance of job duties, determine the rate and manner of pay and negotiate pay rates, and set the hours for the employees. And here we have none of those scenarios. In fact, it's undisputed in the record that Enterprise alone hired and fired Willis. Enterprise alone determined the rates of pay, paid him and provided benefits to him. Enterprise assigned him to the specific well sites that he worked at. He didn't just work at sites where Drill Tech worked. He worked at other sites owned by other owner-operators. So Enterprise is a self-sustained employer taking him to different job sites. Enterprise alone controlled the work schedule of Willis. That's a deposition site of Mr. Willis himself who said they controlled my work schedule. Drill Tech could not hire, fire, or discipline Willis. Enterprise alone trained Willis. Willis admitted there was no training from Drill Tech. Enterprise alone provided tools to Willis in order to do his job. He says there was other items of equipment brought to the site, but he doesn't claim that any of them were actually used by him. The direct supervisor of Willis was from Enterprise, and Willis admitted that in his deposition. And, of course, Enterprise has no documentation whatsoever about personal records, payroll records, anything else associated with Mr. Willis or with Enterprise. And we're talking about California law. I'm sorry? We're talking about California law. We are talking about California law right now. That's the Martinez case, the seminal Supreme Court decision. The second prong of that is the suffer or permit standard. And that, again, hinges on it's not enough to just know someone is working and to allow it. Otherwise, you can see the definition becomes obtuse. The key there, and Martinez says this, is it hinges on the ability to force or prevent someone from working. And, again, here, Drill Tech did not have that ability. They simply didn't. There was nothing in the con, in a, well, there was no contract for them to have any power. And, again, a reporting relationship does not turn a, what is otherwise a peer relationship, into a joint employment one. And if you actually look at the facts of the Martinez case, it's helpful as well, because in that case, there was more, I'll submit there were more incidents of control in Martinez, and summary judgment was granted in that case than in ours. And in that case, there was a farming operation that was deemed to be, well, admitted to be the employer of farmers working in a strawberry field. And the workers were claiming that the produce merchants that were contracted with by the farmer was a joint employer of the farm. So Martinez went through the analysis in that case and looked at the undisputed facts, again, looking at whether there was control over the wages, hours, or working conditions, and whether the workers were suffered and permitted to work by the produce merchants. And in that case, the produce merchants had contracts with the farmer, and they did have some control over the wages to the extent that they relied on the merchants for payments. That's what the Martinez case said. The produce merchants actually made assurances to the farm workers that they were making payments to the farmer to encourage them to keep working on certain situations. The merchants were in the fields. Merchant representatives were in the fields on harvesting days, explaining how they wanted the strawberries picked, how they wanted them picked, and they demonstrated the packing style to those workers. They would also check the packed strawberries to make sure they were in compliance and then would talk to counsel, evaluate, discipline, however you want to describe it, talk to the farm workers about how they needed to be picking those. And they would actually talk directly to the laborers, pointing out mistakes in the packing or if there were rotten or green berries in the packing. The Supreme Court upheld summary judgment in that case for the produce merchants. It shows you that there is the control element is central. And in that case, at the end of the case, the Court, in looking at the suffer and permit standard, indicated that the fact that the produce merchants didn't have the right to direct the laborers' work was central, whether or not there was a perceived direction or not, because then we go well down a slippery slope, I think, as Your Honors can see, and anyone can tell anyone else what to do.  Maybe it's a recommendation. We also cited in the case law the definitions of supervisor under the NLRB and the FEHA, which I think are instructive. Now, even the tests set out here, supervise is not enough under any of these tests. But in those cases, clearly, it acknowledges the fact that many people are going to be told what to do in a workplace, and it does not create a supervisory relationship. The Martinez case is a little different because they weren't working side by side with respect to the day-to-day work. Well, I would submit that they were out in the field. That's the record that said the representatives were out there, and they were telling them what to do. So in a sense, they were in the field together. I don't believe they were. They weren't picking strawberries. They were involved in the actual work. But drill tech and enterprise are in the same field but doing completely different tasks. And there's a coordination task, and there's a mud testing task, which is with the mud engineer. Really quickly, I have one minute left. The FLSA part of this case, I think, is even easier to address, and that's where the court was even more thorough in looking at the economic realities because if you look at the economic realities here, clearly with no relationship, I think it falls flat right there. The case that is most on point is the Moreau case. I hope I'm saying that correctly, M-O-R-E-A-U, the Ninth Circuit decision, which found that when an airline contracted with baggage handlers and other service providers at the airport, again, had a lot of on-hands control, gave direction as to what they wanted, their summary judgment, again, was upheld for the airline based on the fact that the airline couldn't hire or fire the employees, they didn't have employment records, they didn't set or control the work schedules, and they didn't establish conditions upon which the employees would receive payments. So, again, the fact that there may be some, quote, unquote, control in the form of a directive here or there is not dispositive, and summary judgment, I think, was appropriately upheld in this case. Thank you, Counsel Rebuttal. Your Honor, I had a question about how the operation ran, and it's true there was an owner-operator, and let's take a look at the evidence of what the owner-operator said as to the company men, and also the drill site, the well site supervisors who were the drill tech people. This is what Lynn said in a declaration. The mud engineers who worked at Lynn drilling locations are supervised by company men, who are also known as well site supervisors or site supervisors. Drill tech and enterprise are staffed by experts in drilling fields, and those experts hire, assign, and supervise mud engineers. So we have direct supervision here by Lynn itself, by the statements of Lynn itself, saying we hire drill tech to supervise all these subs. This is not just come here and do your job. This is come here and do the job. We're running the show. That's why they call them drill site runners, drill site supervisors, managers. They ran every operation of that business. The citation to the federal authority in Moreau is not applicable. That was a federal case, not applying California law. And here, let's take a look at the issue of what they told them to do. It wasn't just like they were taking some suggestions. They told them what to do. Mr. Willis testified in his declaration. The drill tech company man had the power to tell him what to do and could stop him from doing something that was different that they wanted done. When Willis would do a mud test, he'd make recommendations. The drill tech company man could make the final decision about what to do or what not to do. There were times when they told Willis they disagreed with him and told him not to add materials that he had recommended and to add different materials. And he had to follow their instructions because they ran it. That's controlling the operations. That's controlling the working condition. You're claiming violations of both the California law and the FLSA. That's correct. And we feel that the control that's clearly here and the sufferer permit under California law is sufficient also under the FLSA. Okay. And I think that the court got it wrong and counsel has it wrong in the sense of they're looking at these common law indicia of employment. Well, that's after Martinez. That doesn't matter. You look at the wage order requirements, which is control the hours clearly here, when to come in, wake up at night, come and do this work right now because we need it. It's an emergency. You can't go into town if you want to unless you get our permission. Do this test this way. Yeah, you recommended that we do this. No, I want you to do something else. I want you to do something else. And that's clearly control of the working conditions. In terms of the sufferer permit issue, there's no dispute, and I think the district court recognized that they had the ability to prevent them, to basically kick them off the site and thereby prevent them from working. And that's undisputed in the record that they had that ability. And it wasn't all speculation. Mr. Willis testified that drill tech company men told him that they had run off mud men from drill sites before and that if you were run off by one company drill site manager, you could not expect to get any other jobs with any other drill tech company men because they would not use you. Well, that's the ability to prevent you from working directly or indirectly. You don't have to have the power to do it. Briefly, in the Torres Lopez v. May case, the Ninth Circuit case, the court said that it's the right directly or indirectly to hire a fire. And they talked about the facts in that case, how you can control the harvest schedule and the number of workers needed and advised when to begin harvest and which days were suitable and to call the harvest day off. That was enough under the Ninth Circuit set to find a support joint employment. And again, finally, we're not here after a trial on the merits where the district court judge was the finder of fact and she considered all this evidence. We're here on a summary judgment. And clearly, the evidence before the court is sufficient to support a finding by a jury that there was an employment relationship under the applicable California law and the FLSA law. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar, Johnna Corporation v. City of Sunnyvale, has been submitted on the briefs. The next case on calendar for argument is Johnson v. Oracle America.
judges: Schroeder, Rawlinson, Lasnik